330 P.2d 126

George D. EYRE, Administrator of the Estate of Cecil Drewery Eyre, deceased, Plaintiff and Appellant,

v.

Michael Frank BURDETTE, Defendant and Respondent.

No. 8829.

Supreme Court of Utah.

Oct. 7, 1958.

Rawlings, Wallace, Roberts & Black, Salt Lake City, for appellant.

Gordon R. Strong, Salt Lake City, for respondent.

WORTHEN, Justice.

Appeal from a judgment entered upon the verdict of a jury in favor of defendant.

The action was brought for the wrongful death of Cecil Drewery Eyre, who will be referred to herein as Mr. Eyre or decedent. At the time of the accident

the decedent was an occupant of an automobile belonging to and being driven by the defendant. The only other occupant of the automobile was Lorene Massardi.

The appellant alleged that the decedent was a passenger for hire and that defendant was guilty of wilful misconduct and of intoxication. The court instructed the jury that decedent was a guest.

There was considerable conflict in the testimony as to the defendant's driving and whether or not he was intoxicated. The jury resolved the questions of his intoxication and as to whether he was guilty of wilful misconduct in favor of defendant and we are not disposed to disturb its finding. There was substantial evidence to sustain the judgment.

Appellant strenuously insists that the trial court committed reversible error in holding as a matter of law that the deceased was a guest in defendant's automobile.

It is established that decedent's wife obtained an interlocutory decree of divorce in California about a year prior to his death. She lived in California and he in Utah. After separating from his wife decedent raised some chickens on a farm in Draper, Utah, owned by his sister.

Mrs. Massardi testified that she and decedent left her apartment about four p. m. of the day the accident happened; that they went to a store to pick up an empty crate; that the crate wasn't empty so they went into the B Z B Inn close by; that defendant came in the bar and sat down at their table and "him and Mr. Eyre started talking about the chickens and the eggs * * * and I said to Mr. Eyre 'we better go get them because it is getting late, we better go and gather up the eggs, because it is getting late.'"

Mrs. Massardi was asked the following questions and gave the indicated answers:

"Q. Mrs. Massardi, will you tell me what the purpose of this trip was out to the farm? A. Yes. To feed the chickens and gather the eggs.

"Q. All right. Did you hear anything mentioned, or talked about between Mr. Eyre and Mr. Burdette, any other reason than that mentioned for going out to the farm? A. No."

Under cross-examination by defendant's counsel Mrs. Massardi testified:

"Q. Now, Mrs. Massardi, about these eggs, *you and Mr. Eyre customarily went out there every night and got eggs and brought them in,* did you not, *and fed the chickens?* A. Yes,— Sometimes went twice a day.

"Q. That is what you intended on doing when you left this B Z B you were going out to feed the chickens and gather eggs. A. *That is what we intended doing when we went to the B Z B,* went to get crates to put the

eggs in when we gathered them." (Emphasis added.)

Extensive testimony was offered by appellant to show that in the trip from the B Z B Inn to the Draper farm where decedent kept his chickens the decedent was a passenger in defendant's car.

The only witnesses who testified about the conversations and negotiations preceding the trip to Draper were Mrs. Massardi and the defendant. It is not disputed that defendant worked at Eimco Corporation, and that he had a part time job as bartender at the B Z B Inn located at 2nd South and 5th West. He got off work on the day in question at three o'clock; went home and then went to the B Z B about 4:30 to see if the owner Mr. Bollinder wanted him to work that evening. The proprietor was out but expected back soon. Mr. Eyre was sitting in a booth and called him over; he had met Mr. Eyre while he was tending bar there. Defendant testified that he had nothing to drink until he came to the B Z B about 4:30; that he had only two short beers.

Defendant testified as follows:

"Q. While you were sitting there, what was your discussion, what was the subject of your conversation? A. We sat there and talked a little while, I was waiting for Mr. Bollinder to come in, Mr. Eyre mentioned the fact he had some eggs.

"Q. What did he say about his eggs? A. He had them for sale.

"Q. Was anything said about anybody buying them? A. We talked about them for a little while. He said he could sell them cheaper than we could buy them. I said I couldn't use too many. Mr. Eddington, the bartender and I agreed to take half of a case between us, and when Mr. Bollinder came in we would ask if he would take another half case—he wanted to sell full cases.

"Q. When Mr. Bollinder came in, was anything said about taking half of a case? A. It was agreed right there.

"Q. Was anything said about where the eggs were to be delivered? A. They were going out to get them.

"Q. Who was going to get them? A. Mr. Eyre.

* * * * * *

"Q. Now, was anything said about when and where the eggs were to be delivered to you?

* * * * * *

"A. They were going out to get the eggs, that is what they said they had to do was feed the chickens.

"Q. When was it said they would deliver them to you, when would you get them? A. When Mr. Bollinder was there and Mr. Eddington.

"Q. You were going to buy some eggs, where were the eggs to be delivered? A. *At the B Z B.*

"Q. *Was anything ever said about you going out to the ranch to get the eggs?* A. No sir.

"Q. How come you happened to go out to the ranch? A. *I was invited to go out to the ranch.*

"Q. How did that suggestion come up? A. We was leaving, when we got out the door and got outside, *Mr. Eyre asked if I would like to go along.* I said I had some free time, I would go with him.

"Q. Was anything said about whose car you would go in? A. His car was there, mine was around the corner, I asked whose car we would go in, his or mine. I mentioned the fact *I had a full tank of gas, and we went in mine.*" (Emphasis added.)

Mrs. Massardi gave the following testimony:

"Q. What, if anything, was said about getting the eggs? A. He mentioned something about selling a crate of eggs, I don't know just how it came about, but the three bartenders with Mr. Burdette—two other bartenders and Mr. Burdette were going to buy a case of eggs for the three of them."

"Q. Was anything said to Mr. Burdette about the price? A. Mr. Eyre said he would sell them to him for less than he got for a case of eggs.

"Q. What did Mr. Burdette say? A. He said that would be a good deal, because they could use them in the bar.

"Q. Then what happened? A. Well, I don't know just how long we were in there, we then started to leave and went outside, and Mr. Eyre and I started to his car, Mr. Burdette's was parked next to it, *I didn't know at that time* Mr. Burdette had a car. He said to Jack 'let's go in mine,' so we got in his car and went." (Emphasis added.)

Appellant relies heavily on the testimony of Burdette given on cross-examination as follows:

"Q. At the time they went with you in your car? A. Well, he invited me to go out.

"Q. I see, but the reason you went out was to get the eggs, wasn't it? A. Not purposely, no.

"Q. Isn't it true you thought this was a pretty good deal he offered you? A. Yes sir.

"Q. You agreed to *buy these eggs?* A. Yes sir.

"Q. And you talked to the bartender and also the owner to see if

they would cut in in this deal with you?
A. He wanted to sell a case of eggs, I couldn't afford one myself.

\*　　\*　　\*　　\*　　\*　　·\*

"Q. Isn't it true in this other hearing in this matter you said nothing about Mr. Eyre inviting you to go out to see this farm, did you? A. I can't remember.

"Q. You can't remember? A. No.

"Q. Let's see if I can refresh your memory then. This is on page 8. It is right near the top.

"Q. What did you do then? A. Well Mr. Eyre made me a proposition to buy some eggs. He said he had quite a few chickens out in Draper, out on a ranch out there, and he said he would make me a deal on some eggs and it sounded all right to me. So I asked Leo if he would like to buy some.

" 'Q. Asked who? A. Leo.

" 'Q. The bartender? A. Yes sir, and he said "sure" and Mr. Eyre said he would like to sell by the case rather than sell a few dozen eggs. So I asked Mr. Bollinder and he said he would be glad to buy a half a case of eggs because he could use them in his business and in his home.'

"I believe that is all—did you so testify at the prior hearing of this matter? A. Yes sir.

"Q. Then it is true, isn't it, that you said nothing at that prior hearing, at that time about Mr. Eyre inviting you just to go out and look over this ranch? A. No sir.

"Q. It is not true? A. No sir. May I have the question again?

"Q. It is true then at this prior hearing then you said nothing about Mr. Eyre [you] coming out to look at this ranch? A. Yes sir.

"Q. At that hearing you testified the purpose, the sole purpose was to go out and get those eggs? A. Yes sir."

Counsel for defendant in redirect examination read into the record the following testimony given by defendant at the prior hearing but which was not brought out by plaintiff's counsel.

"A. Well, Mr. Eyre, he asked *if I would like to accompany them out to the ranch to get the eggs.* I didn't have anything pressing at the time to do so I told him I would be glad to and then I asked him, 'which car shall we take? Shall we go in mine or shall we go in yours.' And he said they would go in my car." (Emphasis added.)

We are of the opinion that an examination of all the testimony offered in connection with the acts of the parties was full warrant for the trial court's instruction to the jury that decedent was a guest.

We are unable to find here the elements essential to give to decedent the status of a passenger:

Section 41–9–2, U.C.A.1953, defines "Guest" as follows:

"For the purpose of this section the term 'guest' is hereby defined as being a person who accepts a ride in any vehicle without giving compensation therefor."

We are unable to find from the facts here set out what compensation decedent gave for his ride. And we are in agreement with the trial court in reaching the conclusion that decedent was a guest as a matter of law.

The record does not disclose that the eggs which were gathered on the evening in question were for defendant and his employer and the other bartender.

The eggs which defendant was to buy were to be delivered at the B Z B—not at the ranch; the deal for the case of eggs in question was consummated before the trip to the ranch and going to the ranch to get them was not one of the terms of the deal.

Mrs. Massardi testified that she and Mr. Eyre went to the ranch every evening to gather the eggs and feed the chickens, and that was what they intended doing when they went to the B Z B while waiting for the crate in which to put the eggs. There is no evidence that defendant's car was used because of any compensation given by decedent. A search of the record would seem to justify the conclusion that if any compensation was given to defendant it was the privilege of having Mr. Eyre and Mrs. Massardi ride with him. But the record discloses facts which would seem to discredit any such conclusion, rather it may well be concluded that defendant suggested taking his car for self-protection.

Mrs. Massardi testified that after she and decedent left her apartment decedent went to the liquor store and bought a pint of whiskey and a 7 UP, and that he had an empty 7 UP bottle in the car, and he mixed a drink for each at that time. The evidence discloses that at the B Z B Inn they drank beer.

It is further established that on the way to Draper Mr. Eyre asked defendant to buy a small bottle of mixer at Riverton, and Mr. Eyre and Mrs. Massardi each had a drink.

When they arrived at the farm Mr. Eyre requested defendant to gather the eggs. Mrs. Massardi showed defendant where the coops were and also showed him the wire container for the eggs, Mr. Eyre never got out of the car. Mr. Eyre asked defendant to feed the chickens which he did; Mrs. Massardi showed defendant where the feed was; at the request of Mr. Eyre defendant bought another bottle of mixer on the

trip from the ranch. The evidence is undisputed that defendant had nothing to drink on the day in question except two short beers, about half foam.

■ The record discloses that Mr. Eyre paid nothing for the ride and there is no evidence that defendant ever requested decedent to go with him or that he received any tangible benefit from the decedent, monetary or otherwise, which was a motivating influence for furnishing the transportation. Under the rule announced by this court in Jensen v. Mower[1] we are of the opinion that the trial court correctly instructed the jury as to decedent being a guest. It should be further observed that appellant having alleged that decedent was a passenger he had the burden of establishing the fact. However, appellant not only failed to sustain his burden, but failed to produce any competent evidence to support said allegation.

Error is assigned in the giving of certain instructions. We have examined the instructions complained of and are of the opinion that no error can be predicated on giving said instructions. We find no merit to any other assignment.

Judgment affirmed. Costs to respondent.

McDONOUGH, C. J., and CROCKETT, WADE, and HENRIOD, JJ., concur.